**LATHAM & WATKINS LLP**
  Michael G. Romey (Bar No. 137993)
  *michael.romey@lw.com*
  Sarah F. Mitchell (Bar No. 308467)
  *sarah.mitchell@lw.com*
355 South Grand Avenue, Suite 100
Los Angeles, California  90071-1560
Telephone:  +1.213.485.1234
Facsimile:  +1.213.891.8763

  Richard P. Bress (*pro hac vice forthcoming*)
  *rick.bress@lw.com*
  Andrew D. Prins (*pro hac vice forthcoming*)
  *andrew.prins@lw.com*
  Eric J. Konopka (*pro hac vice forthcoming*)
  *eric.konopka@lw.com*
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone:  +1.202.637.2200
Facsimile:  +1.202.637.2201

Attorneys for Plaintiffs and the Proposed Class

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MY DREAM BOUTIQUE, a California corporation, on behalf of itself and all others similarly situated; ANAHIT KHACHATRYAN, an individual; NELLI VIRABYAN, an individual; DI ORO SALON, INC., a California corporation, on behalf of itself and all others similarly situated; VARDGES AVETISYAN, an individual; AL-AZIM INC., a California corporation, on behalf of itself and all others similarly situated; RIAZ MOHAMMED, an individual; WESTFIELD PROPERTY MANAGEMENT LLC, a Delaware limited liability company; WESTFIELD TOPANGA OWNER LLC, a Delaware limited liability company; SHERMAN OAKS FASHION ASSOCIATES, LP, a Delaware limited liability partnership; CULVER CITY MALL LLC, a Delaware limited liability company; SANTA ANITA SHOPPINGTOWN LP, a Delaware limited liability | CASE NO. 2:20-cv-8896 **CLASS ACTION COMPLAINT** |

1  partnership; and VALENCIA TOWN
   CENTER VENTURE, L.P., a Delaware
2  limited liability partnership,

3              Plaintiffs,

4        v.

5  COUNTY OF LOS ANGELES;
   COUNTY OF LOS ANGELES
6  BOARD OF SUPERVISORS;
   DR. MUNTU DAVIS, individually and
7  in his official capacity as County of
   Los Angeles Health Officer;
8  DR. BARBARA FERRER, in her
   official capacity as Director, County of
9  Los Angeles Department of Public
   Health; and ALEX VILLANUEVA, in
10 his official capacity as Sheriff, County
   of Los Angeles,

11             Defendants.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

CLASS ACTION COMPLAINT

Plaintiffs My Dream Boutique, a California corporation ("My Dream Boutique"), on behalf of itself and all others similarly situated; Anahit Khachatryan ("Ms. Khachatryan"); Nelli Virabyan ("Ms. Virabyan"); Di Oro Salon, Inc. ("Salon Dioro"), on behalf of itself and all others similarly situated; Vardges Avetisyan ("Mr. Avetisyan"); Al-Azim Inc. ("Al-Azim"), on behalf of itself and all others similarly situated; Riaz Mohammed ("Mr. Mohammed"); Westfield Property Management LLC ("Westfield"); Westfield Topanga Owner LLC; Sherman Oaks Fashion Associates, LP; Culver City Mall LLC; Santa Anita Shoppingtown LP; and Valencia Town Center Venture, L.P. (collectively, "Plaintiffs") allege as follows against Defendants County of Los Angeles (the "County"); County of Los Angeles Board of Supervisors (the "Board"); Dr. Muntu Davis, individually and in his official capacity as County of Los Angeles Health Officer ("Dr. Davis"); Dr. Barbara Ferrer, in her official capacity as Director, County of Los Angeles Department of Public Health; and Alex Villanueva, in his official capacity as Sheriff, County of Los Angeles (collectively, "Defendants"):

## **PRELIMINARY STATEMENT**

1.     This case is about unlawful and unjustifiable action by the County and its officials, ostensibly in the name of protecting public health, that in fact has absolutely no public health justification.  Defendants have forced hundreds of businesses in indoor malls to close, kept thousands of County residents out of work, caused millions of dollars in lost wages and revenue, and brought many businesses to the brink of collapse—without offering a single valid, science- or health-based reason for their actions, and despite the extensive measures indoor malls and their tenants have taken to protect employees and customers.  In doing so, the County and its officials have overtly discriminated against businesses in indoor malls and their employees without any rational basis whatsoever, trampling the constitutional rights of those businesses and individuals.  Plaintiffs bring this lawsuit to stop Defendants' unconstitutional conduct and the massive, irreparable harms Defendants are

inflicting on Plaintiffs, other indoor mall businesses in the County, and their employees.

2. At the beginning of the COVID-19 pandemic, government officials closed businesses on a dramatic and unprecedented scale, attempting to minimize the spread of the disease at a time they knew little about it. Over the past six months, much has been learned about COVID-19, how it spreads, and how that spread can be minimized or prevented. As a result, federal, state, and local officials have regularly revised their guidance, recognizing that many activities—including commercial activities—can be done safely, especially if employees and customers take sensible and effective precautions, such as maintaining social distance and wearing masks. When Plaintiffs were permitted to reopen for a short period this summer, they took these precautions and more to protect employees and customers. For example, My Dream Boutique (operating a children's clothing store in Fashion Square), Salon Dioro (operating a hair salon in Fashion Square), and Al-Azim (operating the Metropolis Big & Tall men's clothing store in Westfield Culver City) each posted signs regarding social distancing, restricted the capacity of the store, required face masks, offered hand sanitizer, implemented extensive cleaning protocols, and kept the entrance open whenever the store was open.

3. The County has generally deferred to the State of California with respect to business closures and reopenings. Over the summer, the County allowed Plaintiffs and other businesses to reopen after the State changed its guidance, and backtracked when the State backtracked.

4. On August 28, 2020, after extensive review of the relevant data and science, the California Department of Public Health issued a statewide order allowing counties throughout the State to reopen indoor malls and shopping centers subject to sensible and effective restrictions, including 25% maximum capacity, closed common areas, and closed food courts in counties where COVID-19 is

deemed "widespread."[1]  That action is consistent with the actions of state and local governments nationwide.  And today, nearly every county has implemented the State's measured, evidence-based approach, and allowed indoor malls and shopping centers to reopen.  Indeed, Orange and San Bernardino Counties, which border Los Angeles County, allowed indoor malls and shopping centers to reopen just days after the August 28 order—and counties with uniformly worse metrics regarding the spread of COVID-19 have done the same.  Plaintiffs would reopen their indoor malls and businesses subject to the restrictions put in place by the State.

5.     Plaintiffs cannot reopen, however, because the County has refused to follow the State's science-based approach.  On September 2, 2020, Dr. Davis, the County of Los Angeles Health Officer, ordered that, in this County, all indoor portions and operations of indoor malls and shopping centers must "remain closed to the public until further notice."[2]  That action breaks sharply from the County's previous practice of aligning its business restrictions with those imposed by the State—as one member of the Board recently recognized.[3]  The County's forced closure of indoor malls and shopping centers stands in stark contrast to its treatment

[1] *See* Exhibit 1, California Department of Public Health, Statewide Public Health Officer Order (Aug. 28, 2020), *available at* https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/8-28-20_Order-Plan-Reducing-COVID19-Adjusting-Permitted-Sectors-Signed.pdf.

[2] *See* County of Los Angeles Department of Public Health, Order of the Health Officer, Reopening Safer at Work and in the Community for Control of COVID-19 (revised Sept. 2, 2020), *available at* http://publichealth.lacounty.gov/media/coronavirus/docs/HOO/2020_09_02_HOO_Safer_at_Home.pdf.  The most recent County Order of the Health Officer was issued on September 4 with minor changes, and no changes to the County's restrictions on indoor malls and shopping centers.  *See* Exhibit 2, County of Los Angeles Department of Public Health, Order of the Health Officer, Reopening Safer at Work and in the Community for Control of COVID-19 (revised Sept. 4, 2020), *available at* http://publichealth.lacounty.gov/media/Coronavirus/docs/HOO/2020_09_04_HOO_Safer_at_Home.pdf.

[3] *See, e.g.*, Board of Supervisors Meeting, at 2:24:55 (Sept. 15, 2020) (statement of Supervisor Barger) ("Early on, this Board agreed to align ourselves with the State, and somewhere along the way . . . we deviated from that. . . . There are areas where we have been given the green light, such as the indoor malls, but we have decided . . . to take a stand back."), *available at* https://lacounty.granicus.com/MediaPlayer.php?view_id=1&clip_id=8051.

of virtually every other retail establishment, including large and small scale retailers and hair salons and barbershops not inside malls—all of which were permitted to reopen immediately and operate at a minimum at 25% capacity, in accordance with statewide guidelines. And the County's departure from the State's order separates it from other California counties—all of which, to Plaintiffs' knowledge, have allowed indoor malls and shopping centers to reopen.

6.    There is absolutely no evidence to support the County's unique and discriminatory treatment of indoor malls and shopping centers. There is no data showing that indoor malls are any less safe than the large retail stores that have been open for months or the "outdoor" malls that the County has permitted to reopen. Nor has the County or any other Defendant offered a data-based explanation—or any reason whatsoever—for this differential treatment. The September 2, 2020 order is out of line with statewide standards, as well as the standards established by state and local governments nationwide.

7.    The County's unique—and uniquely unfavorable—treatment of indoor malls and shopping centers is particularly perverse because the County has seen steady improvement in its COVID-19 transmission metrics since issuing the September 2, 2020 order, but has not bothered to reconsider its position.

8.    This continued unreasoned and unjustified policy has needlessly shuttered hundreds of businesses and thrown thousands of employees out of work, devastating those businesses, their employees, and their families. For example, Al-Azim has been forced to close its Metropolis Big & Tall clothing store, just because it is located in the interior of a County mall. Because Al-Azim depends on foot traffic within the mall to generate business, its sales and profits have plummeted. It has been forced to lay off all of its employees, including Mr. Mohammed and his two brothers, who have operated Metropolis Big & Tall for nearly 30 years. Mr. Mohammed and his brothers have devoted their lives to building and managing their family business, but the forced closure threatens the business's viability. Similarly,

Salon Dioro and My Dream Boutique have been forced to close merely because they are located in the interior of Fashion Square. The owners of these small family businesses have devoted decades to building customer loyalty, but now they have had no choice but to lay off their employees. My Dream Boutique, Salon Dioro, and Al-Azim may permanently shut down their stores if the County does not immediately lift the closure order.

9.     Because of the September 2, 2020 order, hundreds of other businesses at indoor malls and shopping centers in the County also remain closed to the public, depriving them of revenue they desperately need and thousands of employees of gainful employment—all without any justification whatsoever or means to challenge the government's overreaching and arbitrary action.

10.    The County's order has arbitrarily deprived Plaintiffs of their core property interests and other legal rights without due process and in violation of their right to equal protection under the law. It must be struck down to prevent the substantial continuing harm that Plaintiffs, hundreds of other businesses, and thousands of employees at indoor malls and shopping centers throughout the County face because of the actions of the County and the other Defendants.

## THE PARTIES

11.    Plaintiff My Dream Boutique is a California corporation. It owns and operates the store My Dream Boutique, which sells children's clothing, accessories, and shoes. My Dream Boutique is located in the Fashion Square shopping center in Sherman Oaks, California. My Dream Boutique holds a business license from the City of Los Angeles to operate that location. Currently, My Dream Boutique is closed due to Defendants' actions.

12.    Plaintiff Anahit Khachatryan is a resident of the County of Los Angeles. Ms. Khachatryan is an employee and owner of My Dream Boutique.

13.    Plaintiff Nelli Virabyan is a resident of the County of Los Angeles. Ms. Virabyan is an employee of My Dream Boutique.

14.     Plaintiff Di Oro Salon, Inc. is a California corporation.  It owns and operates Salon Dioro, a full-service boutique salon offering hair, skin, and nail services.  Salon Dioro is located in the Fashion Square shopping center in Sherman Oaks, California.  Salon Dioro holds a business license from the City of Los Angeles to operate that location.  Currently, Salon Dioro is closed due to Defendants' actions.

15.     Plaintiff Vardges Avetisyan is a resident of the County of Los Angeles.  Mr. Avetisyan is an employee and owner of Salon Dioro.

16.     Plaintiff Al-Azim Inc. is a California corporation.  It owns and operates Metropolis Big & Tall, which sells men's clothing.  Metropolis Big & Tall is located in the Westfield Culver City shopping center in Culver City, California.  Al-Azim holds a business license from the City of Culver City to operate that location.  Currently, Metropolis Big & Tall is closed due to Defendants' actions.

17.     Plaintiff Riaz Mohammed is a resident of the County of Los Angeles.  Mr. Mohammed is an employee and owner of Al-Azim.

18.     Plaintiff Westfield Property Management LLC is a Delaware limited liability company with its headquarters in Century City, California.  Westfield is a manager of commercial retail real estate throughout the United States, including Westfield Topanga, Fashion Square, Westfield Culver City, Westfield Santa Anita, and Valencia Town Center.  As property manager, Westfield is responsible for operations, including building maintenance and leasing, and employs the management employees for the facilities it manages.

19.     Plaintiff Westfield Topanga Owner LLC is a Delaware limited liability company with its headquarters in Century City, California.  Westfield Topanga Owner LLC owns the Westfield Topanga shopping center in Canoga Park, California.

20.     Plaintiff Sherman Oaks Fashion Associates, LP is a Delaware limited liability partnership with its headquarters in Century City, California.  Sherman Oaks

Fashion Associates, LP owns the Fashion Square shopping center in Sherman Oaks, California.

21.    Plaintiff Culver City Mall LLC is a Delaware limited liability partnership with its headquarters in Century City, California.  Culver City Mall LLC owns the Westfield Culver City shopping center in Culver City, California.

22.    Plaintiff Santa Anita Shoppingtown LP is a Delaware limited liability partnership with its headquarters in Century City, California.  Santa Anita Shoppingtown LP owns the Westfield Santa Anita shopping center in Arcadia, California.

23.    Plaintiff Valencia Town Center Venture, L.P. is a Delaware limited liability partnership with its headquarters in Century City, California.  Valencia Town Center Venture, L.P. owns the Valencia Town Center shopping center in Valencia, California.

24.    Defendant County of Los Angeles is a charter county organized and existing as a legal subdivision under the laws of the State of California.

25.    Defendant County of Los Angeles Board of Supervisors is a five-member governing body, elected pursuant to the County of Los Angeles Charter.

26.    On information and belief, Defendant Dr. Muntu Davis is a resident of the County of Los Angeles.  He is a party to this action in his individual capacity and in his official capacity as County of Los Angeles Health Officer.

27.    Defendant Dr. Barbara Ferrer is a party to this action in her official capacity as Director of the County of Los Angeles Department of Public Health.

28.    Defendant Alex Villanueva is a party to this action in his official capacity as Sheriff of the County of Los Angeles.

## JURISDICTION AND VENUE

29.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under 42 U.S.C. § 1983 and the Equal

Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution.

30.    Jurisdiction is also appropriate in this Court pursuant to 28 U.S.C. § 1343(a)(3) "[t]o redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

31.    This Court has supplemental jurisdiction over Plaintiffs' claims asserted under the Constitution of the State of California pursuant to 28 U.S.C. § 1367(a), because Plaintiffs' state constitutional claims arise from the same nucleus of operative facts as its federal claims and thus form part of the same case or controversy under Article III of the United States Constitution.

32.    The Central District of California is the appropriate venue for this action pursuant to 28 U.S.C. § 1391(b)(1) and (2) because it is a District in which Defendants reside, maintain offices, exercise their authority in their official capacities, and have enforced the order at issue in this case.

## **GENERAL ALLEGATIONS**

### **Plaintiffs Have Safely Operated Retail Stores Inside Shopping Malls During The COVID-19 Pandemic**

33.    COVID-19[4] was declared a pandemic by the World Health Organization on March 11, 2020, and on March 13, President Trump declared a national emergency.  In the days immediately following, state and local officials across the country began issuing "stay-at-home," "shelter-in-place," and similar

---

[4] COVID-19 is a disease caused by the SARS-CoV-2 virus.  The World Health Organization recognizes that the disease name, rather than the virus name, is used "to enable discussion on disease prevention, spread, transmissibility, severity and treatment."  World Health Organization, *Why Do the Virus and the Disease Have Different Names?*, https://www.who.int/emergencies/diseases/novel-coronavirus-2019/technical-guidance/naming-the-coronavirus-disease-(covid-2019)-and-the-virus-that-causes-it (last visited Sept. 28, 2020).  Consistent with that purpose, this complaint will refer to COVID-19 rather than the virus that causes it.

orders requiring individuals to remain in their homes with limited exceptions. During this period of great uncertainty about COVID-19 and how it spreads, many of these orders also required all non-essential businesses to temporarily close in-store activities, and some initially required the complete closure of common areas of malls and shopping centers. These closures included Westfield Topanga, Fashion Square, Westfield Culver City, Westfield Santa Anita, and Valencia Town Center, along with malls and shopping centers throughout the United States.

34.    As state and local governments learned more about COVID-19, how it spreads, and how the likelihood of spread can be minimized, they gradually scaled back restrictions on individuals and commercial activities, including retail operations. These governmental actions were typically combined with sensible, achievable, and effective measures meant to inhibit the person-to-person spread of COVID-19, such as disinfectant protocols, occupancy limitations, social distancing, and the mandatory wearing of face masks.[5]

35.    My Dream Boutique, Salon Dioro, and Metropolis Big & Tall were open from mid-June to mid-July 2020, when all mall operations were permitted to open in the County. During this time, My Dream Boutique, Salon Dioro, and Al-Azim took extensive precautions to safeguard the health of employees and customers. Among other things, each of the stores posted applicable County protocols in their stores, enforced social distancing requirements, required face masks, offered hand sanitizer in the store and at the entrance, implemented extensive cleaning protocols, and kept the entrances propped open while their stores was open. Salon Dioro installed Plexiglas partitions between each salon station and only allowed customers to use every other station, while My Dream Boutique and Al-

---

[5] *See, e.g.*, Governor of Texas, Executive Order GA 18, at 3 (Apr. 27, 2020), *available at* https://gov.texas.gov/uploads/files/press/EO-GA-18_expanded_reopening_of_services_COVID-19.pdf.

Azim did not allow customers to use dressing rooms. Each of the stores operated at 50% maximum capacity at all times, in accordance with County requirements.

36.    State and local governments overwhelmingly have recognized that, with appropriate limitations and measures, most retail business, including those inside indoor malls and shopping centers, can be operated safely. Indeed, Westfield safely manages multiple indoor malls throughout California (and across the United States), following state and local modifications on operations and its own stringent protocols, and with the utmost attention to the health and safety of its employees, contractors, retailers, and customers.

### Westfield's Shopping Centers Are Safe, But Nonetheless Interior Retailers Have Been Forced To Close Indoor Operations

37.    On March 19, 2020, due to the COVID-19 pandemic, the County initially ordered the closure of all indoor malls and shopping centers, including Westfield Topanga, Fashion Square, Westfield Culver City, Westfield Santa Anita, and Valencia Town Center. Only "Essential Businesses" with entrances accessible to the public from the exterior of the indoor mall or shopping center were permitted to reopen. On May 26, the County issued an Order allowing indoor operations of malls and shopping centers to reopen. Westfield Topanga, Fashion Square, Westfield Culver City, Westfield Santa Anita, and Valencia Town Center each reopened shortly thereafter, with appropriate and effective safety precautions going above and beyond State and local requirements.

38.    On July 13, in response to a statewide surge in cases, the California Department of Public Health issued a Statewide Public Health Officer Order closing all indoor malls in the County, although retailers with exterior entrances and essential businesses were permitted to remain open. The County then issued a public health order on July 14 mirroring the new restrictions.

39.    My Dream Boutique, Salon Dioro, Al-Azim, and the vast majority of retailers at Westfield Topanga, Fashion Square, Westfield Culver City, Westfield

Santa Anita, and Valencia Town Center are "interior retailers," meaning they have no separate entrance accessible to the public from the exterior of the mall; *i.e.*, customers must enter the indoor common area of the mall to access these retailers. "Exterior retailers" are currently permitted to open for indoor operations at 25% capacity (with the exception of restaurants with exterior entrances, which are open only for outdoor dining and takeout), but these retailers constitute only six of Westfield Topanga's over 200 retailers, five of Fashion Square's over 100 retailers, 19 of Westfield Culver City's over 160 retailers, 45 of Westfield Santa Anita's over 200 retailers, and 71 of Valencia Town Center's over 160 retailers. And only a handful of interior retailers at these malls operate non-food service essential businesses, such that they may invite consumers into their spaces by appointment to provide essential services, including optometry appointments. The remaining retailers at Westfield Topanga, Fashion Square, Westfield Culver City, Westfield Santa Anita, and Valencia Town Center—nearly 700 interior retailers—have, like My Dream Boutique, Salon Dioro, and Al-Azim, been permitted to offer sales only through curbside pickup or delivery since July 13.

40. These closures have continued despite the extensive COVID-19 exposure mitigation protocols that Westfield has implemented to ensure the safety of its retailers, their customers, and its own personnel. Westfield partnered with Bureau Veritas, a recognized world leader in testing, inspection, and certification services, to conduct a review and audit of Westfield's world-class COVID-related health and safety practices, policies, and procedures. By September 2020, Bureau Veritas had certified several United States shopping centers with the industry-leading hygiene and safety excellence label, "SafeGuard." This label is applied to a property only after an on-site audit and certification that the property has implemented policies and procedures aligned with local regulatory requirements and health and safety practices which support mitigation of the spread of COVID-19. All of Westfield's indoor County malls—Westfield Topanga, Fashion Square,

Westfield Culver City, Westfield Santa Anita, and Valencia Town Center—have been SafeGuard certified. That is for good reason. As discussed below, Westfield has taken extensive measures to ensure a safe and healthy shopping environment, and its indoor County malls are exceptionally safe.

41. ***Westfield Topanga*** is an over 2 million square foot mall. It and its tenants normally employ approximately 4,300 individuals. From October 2016 to December 2019, Westfield Topanga underwent extensive renovations costing over $70 million, and has upgraded its heating, ventilation, and air conditioning ("HVAC") systems to use state-of-the-art MERV 11 air filters. The mall has vast and voluminous multistory pavilions that provide ample room for every patron to maintain social distancing and greatly reduce the risks of COVID-19 exposure. Walkways in the mall are 12 to 25 feet wide, and ceiling heights range from 30 to 80 feet.

42. ***Fashion Square*** is an over 850,000 square foot mall. It and its tenants normally employ approximately 2,000 people. The mall completed a $1.7 million construction project in January 2020. Walkways in the mall are 12 to 48 feet wide, and ceiling heights range from 20 to 50 feet.

43. ***Westfield Culver City*** is an over 1 million square foot mall. It and its tenants normally employ approximately 2,800 people. The walkways and ceiling heights throughout the mall allow for ample social distancing and air flow—with walkways 11 to 30 feet wide and ceilings 19 to 62 feet high.

44. ***Westfield Santa Anita*** is an over 1 million square foot mall. It and its tenants normally employ approximately 3,900 individuals. The mall's walkways are generally over 30 feet wide, and its ceilings are 14 to 50 feet high. The mall implemented a one-way traffic system on the second level to direct customer traffic flow, and also has plans in place to limit vehicular traffic in the event that capacity limits are reached.

45.     ***Valencia Town Center*** is an over 1 million square foot mall.  It and its tenants normally employ approximately 3,700 people.  Walkways in the mall are 10 to 35 feet wide, and ceiling heights range from 35 to 60 feet.  Valencia Town Center meticulously analyzed its hourly capacity tracking data from 2019 and confirmed that the mall has more than enough space to reopen while complying with social distancing guidelines.

46.     In accordance with Westfield's protocols and local, County, and State requirements, Westfield Topanga, Fashion Square, Westfield Culver City, Westfield Santa Anita, and Valencia Town Center have implemented extensive measures to reduce the risk of COVID-19 transmission and to protect employees, retailers, and customers.  These measures include signage, queueing markers, traffic flow arrows, and other cues throughout the properties promoting active symptom monitoring; making mask wearing mandatory, hand washing, and physical distancing; hand sanitizers installed at entrances and throughout the malls; dedicated janitorial teams focused on frequent and intense cleaning of all high-touch areas; technology to measure and track visitor capacity in real time and quickly activate mitigation plans; closure of common areas and seating in the food courts; and extensive training and continual patrolling by mall security staff to ensure compliance with all protocols.

### California Permits Indoor Malls To Open At Reduced Capacity

47.     On August 28, 2020, the California Department of Public Health issued a Statewide Public Health Officer Order establishing a system that places each California county into a Tier based on health data, including case rates per capita and percentage of positive COVID-19 tests.  *See* Exhibit 1 ("Statewide Order").  The County is currently in "Tier 1," and Tiers are updated weekly as data is tracked. Beginning August 31, Tier 1 counties were permitted to reopen indoor malls and shopping centers, including their interior retailers, with maximum 25% capacity, closed common areas, and closed food courts.  Tier 1 counties were also permitted to open all other indoor retail stores with maximum 25% capacity.

48.     California's treatment of indoor malls and their retailers is consistent with how these businesses are being treated throughout the United States.   To Plaintiffs' knowledge, no state or California county other than the County of Los Angeles requires indoor operations of malls and their retailers to remain closed.  In fact, Westfield and its affiliates own 89 shopping centers across the globe, and only its properties in the County remain closed.

**The County Health Officer's Order Opens All Retail Stores For Business, Except Those Located In Indoor Malls**

49.     The Statewide Order provides: "A local health jurisdiction may continue to implement or maintain more restrictive public health measures," but only "***if the jurisdiction's Local Health Officer determines that health conditions in that jurisdiction warrant such measures***."  Statewide Order ¶ 4 (emphasis added).  To Plaintiffs' knowledge, all California counties except the County of Los Angeles have aligned with the provisions of the Statewide Order and have allowed indoor malls and shopping centers to reopen.  For example, on August 31, Westfield reopened indoor operations at malls in Riverside, Santa Clara, and Placer Counties, all of which were Tier 1 counties at the time of reopening.

50.     On September 2, 2020, Dr. Davis, the Health Officer for the County of Los Angeles, issued an order titled "Reopening Safer at Work and in the Community for Control of COVID-19."  *See* Exhibit 2 ("County Order").[6]  Paragraph 9 of the County Order describes a category of "Lower-Risk Businesses."  "Lower-Risk Businesses are businesses that are not specified in Paragraph 7 of this Order"—such as indoor dining, bars, and entertainment venues, which must remain closed—"and not defined as Essential Businesses in Paragraph 18 of this Order"—such as banks, hardware stores, and grocery stores.

---

[6] The County Order was revised on September 4, 2020, but the revisions are not relevant to this Complaint.  *See supra* note 2.

51.    The County Order defines indoor malls and shopping centers as Lower-Risk Businesses, recognizing the inherently safe nature of those facilities.  County Order ¶ 7(d).  My Dream Boutique, Salon Dioro, Al-Azim, and other interior retailers in indoor malls, such as retail stores selling clothes, shoes, toys, jewelry, books, and sunglasses, are also defined as Lower-Risk Businesses.  And, in general, Lower-Risk Businesses, including large department stores, small retailers, and hair salons and barbershops not inside malls are now able to open to the public with capacity limitations.  *See* County Order ¶ 7(a), (e).

52.    The County Order thus claims that it "aligns the County with" the Statewide Order, "which describes a tiered approach to relaxing and tightening restrictions on activities based upon specified criteria[.]"  County Order ¶ 1.  And that is true in many respects.  But when it comes to indoor malls and their interior retailers, the County Order differs sharply from the Statewide Order—as a member of the Board recently acknowledged.[7]  Even though the County Order recognizes that these indoor malls and retail businesses are Lower-Risk Businesses, the County has ordered them to remain closed.  Paragraph 9(d) provides:

> ***For Indoor Malls and Shopping Centers***, defined as:  A building with (7) or more sales or retail establishments with adjoining indoor space, ***all indoor portions and operations remain closed to the public until further notice***.  Businesses located entirely within the interior of an Indoor Mall or Shopping Center that are not temporarily closed pursuant to Paragraph 7 of this Order, may offer goods and services via outdoor curb-side pickup.  Businesses or activities that are part of an Indoor Mall or Shopping Center and that are not closed pursuant to Paragraph 7 of this Order, but that are accessible to the public from the exterior of the Indoor Mall or Shopping Center may remain open to the public.

(Emphasis added.)

53.    As a result of Paragraph 9(d), interior retailers at Westfield Topanga, Fashion Square, Westfield Culver City, Westfield Santa Anita, and Valencia Town

---

[7] *See supra* note 3.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

CLASS ACTION COMPLAINT

Center that are Lower-Risk Businesses, including My Dream Boutique, Salon Dioro, and Al-Azim, are unable to open to the public, and employees of these retailers, such as Ms. Khachatryan, Ms. Virabyan, Mr. Avetisyan, and Mr. Mohammed, are unable to return to work.  But they would be able to open to the public and resume work if the retailers had an exterior entrance or were not otherwise located within an indoor mall.

54.     Appendix E to the County Order details "Protocols for Shopping Center Operators."  *See* Exhibit 3 ("Appendix E").  Appendix E allows businesses located entirely within the interior of a mall or shopping center only to offer "online ordering and curbside pick-up outside the shopping center" in accordance with the following guidance:

> Retailers that choose to offer curbside pick-up should set pick-up times for items so that employees are able to bring pre-ordered items [to] customers at a designated site or sites outside the mall.  Pick-up sites should be clearly marked and customers should be encouraged to pre-pay for their orders.  On arrival, customers should notify the employees that they have arrived for pick-up and should remain in their car.  An employee, wearing a cloth face covering should bring the customer's order to the designated pick-up site in a container (e.g., a bin, shopping cart, or other container) and place it directly in the customer's trunk.

55.     The County Order's allowance of strictly regulated outdoor pickup has not provided meaningful relief to My Dream Boutique, Ms. Khachatryan, Ms. Virabyan, Salon Dioro, Mr. Avetisyan, Al-Azim, Mr. Mohammed, the hundreds of retailers Countywide that have been forced to close, and the thousands of employees Countywide who have lost work.  Currently offering curbside pickup are 35 of Westfield Topanga's 212 interior retailers, 19 of Fashion Square's 98 interior retailers, 17 of Westfield Culver City's 142 interior retailers, 28 of Westfield Santa Anita's 156 interior retailers, and 11 of Valencia Town Center's 93 interior retailers. Curbside pickup is just not feasible for many businesses and is not an adequate

substitute for in-person shopping, and provides little if any relief to the hundreds of interior retailers at these five malls.

56.    Al-Azim has not implemented curbside pickup because Metropolis Big & Tall's business depends on foot traffic within the mall, as do many other interior retailers.  Salon Dioro also has not offered curbside pickup because salon services, which cannot be offered curbside, are the heart of its business.  My Dream Boutique has attempted to implement a curbside pickup program, but the expense of promoting and managing curbside pickup has not been worth the returns.  Since March 2020, My Dream Boutique has only completed about 20 curbside orders.

57.    Appendix E also details how "Essential Businesses" located in a mall or shopping center's interior may operate:

> Essential services that operate inside a shopping center such as medical services (clinics or optometrists) may continue to operate.  If these businesses do not have a door that opens to the exterior of the center, these businesses should work by an appointment-only system.  Staff should meet each patient/client at the mall entrance and escort them to the service location.  As much as feasible other methods such as telemedicine options or on-line services should be offered.

58.    Very few interior retailers at Westfield Topanga, Fashion Square, Westfield Culver City, Westfield Santa Anita, and Valencia Town Center offer "essential services," and those that do must operate by appointment only, with employees escorting customers into and out of the mall.  Currently only a few optometrists and a UCLA Health primary care office are open by appointment in these locations.

59.    The County's forced closure of indoor operations at Westfield Topanga, Fashion Square, Westfield Culver City, Westfield Santa Anita, and Valencia Town Center severely limits Westfield's and the mall owners' returns on their significant investments of time and resources devoted to making these malls prime shopping locations in their neighborhoods.  And despite the forced closure, the mall owners and Plaintiffs must still pay substantial state and local taxes, as if

the malls were open for business as usual.  This tax burden is significant—
Westfield's indoor County malls generate approximately $20 million in real estate
taxes annually.

60.    In sum, the County Order requires closure of all indoor operations of
malls and their interior retailers, except to the extremely limited extent that interior
retailers may offer curbside pickup entirely outside of the mall, and interior Essential
Businesses may offer essential services by appointment only.  The County Order
stands in direct contradiction to the Statewide Order.

**<u>Defendants Have Offered No Valid Reason For</u>**

**<u>Their Departure From Statewide Policy</u>**

61.    While indoor malls and their interior retailers are now open and
operating safely *elsewhere* in California and the United States, and large and small
retail stores *not* located in indoor shopping centers or malls are now open and
operating safely in the County, indoor shopping centers and their interior retailers in
the County, like My Dream Boutique, Salon Dioro, and Al-Azim, uniquely remain
closed, and many of their employees, like Ms. Khachatryan, Ms. Virabyan, Mr.
Avetisyan, and Mr. Mohammed, remain out of work—without any explanation or
any scientific support.  Although the Statewide Order allows local health
jurisdictions to implement more restrictive public health measures "if the
jurisdiction's Local Health Officer determines that health conditions in that
jurisdiction warrant such measures" (Statewide Order ¶ 4), Dr. Davis has not
identified any "health conditions" in the County justifying the County's refusal to
align with the Statewide Order and nationwide practice with respect to indoor malls
and shopping centers.  Nor has any other Defendant.

62.    The State's data does not support treating Los Angeles County
differently from other Tier 1 counties.  For example, the State currently classifies
Los Angeles and Imperial Counties as Tier 1, *i.e.*, counties where COVID-19 is
deemed "widespread."  The key factors that the State uses for tiering are uniformly

worse in Imperial County:  Its most recent adjusted case rate for tiering purposes was 8.9 new COVID-19 positive cases per day per 100,000 people (vs. 7.0 for Los Angeles County) and a 9.0% positivity rate (vs. 2.8% for Los Angeles County).[8] But, inexplicably, indoor malls and shopping centers in Imperial County are allowed to be open, while those in Los Angeles County must remain closed.[9]

63.    In addition, the State's data for Los Angeles County has been consistently improving.  When the County Order was issued, the County's adjusted case rate for tiering purposes was 12.3 (vs. 7.0 now) and its positivity rate was 5.0% (vs. 2.8% now).  Despite this improvement in the data, the County has not revisited its decision to close indoor malls and shopping centers, showing that the data and science are not driving the decision.

64.    The County Order provides no explanation whatsoever for its industry-specific departures from State mandates.  *See* County Order ¶¶ 10-14.  And there is no valid public health reason for treating indoor malls and their interior retailers differently.  The only even arguable distinction between interior retailers (like My Dream Boutique, Salon Dioro, and Al-Azim) and other retailers with exterior entrances, including big box stores, is the need to pass through notably wide, high-ceilinged, and well ventilated interior corridors for access—as opposed to narrow outdoor sidewalks where social distancing, mask usage, and other protocols are not enforced—and that distinction does not support treating indoor malls and their interior retailers more restrictively.

65.    The data and science do not support any hypothesis that those wide and high-ceilinged interior corridors pose any greater risk of transmitting COVID-19.  Plaintiffs are unaware of any support—and the County Order identifies none—for

---

[8] *See* California Blueprint for a Safer Economy, https://covid19.ca.gov/safer-economy (last visited Sept. 28, 2020).

[9] *See* County of Imperial, Order of the Health Officer at 6 (Aug. 30, 2020), *available at* http://www.icphd.org/media/managed/healthofficerorders/Health_Officer_Order_8_30_2020_v2_002_002_.pdf.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

the notion that settings such as spacious indoor malls and shopping centers with modern and well-maintained HVAC systems, and their interior retailers, present greater risks when compared to the large and small retailers and other businesses that the County has permitted to remain open.

66.    The World Health Organization has advised that a "well-maintained and operated [HVAC] system can reduce the spread of COVID-19 in indoor spaces by increasing the rate of air change, reducing recirculation of air and increasing the use of outdoor air."[10]  The Global Heat Health Information Network, an independent network of scientists and policymakers, completed a review of the available evidence and concluded:  "Air conditioning and ventilation are considered effective control strategies for preventing workplace infection and ill health," and "there is no strong evidence to suggest that a well-maintained air conditioning, ventilation, or other type of climate control system will contribute to the transmission of COVID-19."[11]

67.    Indeed, two recent studies reported that the virus was not detected at all in air samples in the immediate vicinity of COVID-19 patients in hospitals, despite significant viral load in the patients' respiratory secretions.[12]  Another recent study

---

[10] *Q&A: Ventilation and Air Conditioning and COVID-19*, WORLD HEALTH ORGANIZATION (July 29, 2020), https://www.who.int/news-room/q-a-detail/q-a-ventilation-and-air-conditioning-and-covid-19 (last visited Sept. 28, 2020).

[11] *Q&A: Do Air Conditioning and Ventilation Systems Increase the Risk of Virus Transmission?  If So, How Can This Be Managed?*, GLOBAL HEAT HEALTH INFORMATION NETWORK (May 22, 2020), http://www.ghhin.org/heat-and-covid-19/ac-and-ventilation (last visited Sept. 28, 2020).

[12] Vincent C. C. Cheng, *et al.*, *Escalating Infection Control Response to the Rapidly Evolving Epidemiology of the Coronavirus Disease 2019 (COVID-19) Due to SARS-CoV-2 in Hong Kong*, 41 INFECTION CONTROL AND HOSPITAL EPIDEMIOLOGY 493, 497 (2020), *available at* https://www.cambridge.org/core/journals/infection-control-and-hospital-epidemiology/article/escalating-infection-control-response-to-the-rapidly-evolving-epidemiology-of-the-coronavirus-disease-2019-covid19-due-to-sarscov2-in-hong-kong/52513ACC56587859F9C601DC747EB6EC; Sean Wei Xiang Ong, *et al.*, *Air, Surface Environmental, and Personal Protective Equipment Contamination by Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) from a Symptomatic Patient*, 323 JAMA 1610 (2020), *available at* https://jamanetwork.com/journals/jama/article-abstract/2762692.

found that on a January 2020 flight from China to Canada, two patients with COVID-19 (one of whom was actively symptomatic) did not transmit the virus to any of the 25 passengers seated nearby.[13]   And there have been no reports of COVID-19 transmission due to air recirculation at indoor malls, shopping centers, or retail stores.

## The County Order Arbitrarily Treats
## Similarly Situated Businesses Differently

68.    At the same time that the County has chosen to depart from the Statewide Order and nationwide practice by closing indoor malls and their interior retailers, the County has allowed comparable businesses to remain open for months, including large retail stores (such as big-box stores and multilevel department stores with elevators and escalators and narrow passage ways) and "outdoor" malls.

69.    The County Order allows large stores such as Walmart, Target, Costco, Best Buy, and Cost Plus World Market to operate within miles of the County's indoor malls.  Although each of those stores sells essential items, they also on that account are allowed to open all of their departments for in-store shopping and thus sell any other products in their inventory including an enormous variety of non-essential items.  However, stores that sell comparable items in the interior of the County's indoor malls are unable to do so under the County Order, and employees of those stores are unable to resume their work.

70.    For example, Walmart may sell clothing one mile from Westfield Topanga, but clothing stores such as America Eagle cannot resume indoor operations under the County Order simply because they are located in Westfield Topanga's interior.  Amy's Hallmark Shop, located in Westfield Santa Anita's interior, has been forced to stop selling gifts, cards, and stationery, but Cost Plus World Market

---

[13] Kevin L. Schwartz, *et al.*, *Lack of COVID-19 Transmission on an International Flight*, 192 CANADIAN MEDICAL ASSOCIATION JOURNAL E410 (2020), *available at* https://www.cmaj.ca/content/192/15/E410.

continues to sell the same types of items only two miles away.  And customers may purchase cell phone cases and chargers at Best Buy less than two miles from Valencia Town Center, but ZAGG is prohibited from welcoming customers in Valencia Town Center's interior to purchase the same products.  But there is no reason to believe that, by virtue of their placement, stores within indoor malls and shopping centers (which almost uniformly have wide, high-ceilinged, and well-ventilated interior walkways) as a class are riskier than stores located elsewhere. There is no rational basis for this differential treatment of American Eagle, Amy's Hallmark Shop, ZAGG, and hundreds of other interior retailers—and neither the County nor any other Defendant has offered one.

71.    The County's arbitrary treatment of interior retailers is evident across the County's indoor malls as well.  Large, multilevel stores like Nordstrom, Macy's, and JCPenney have been permitted to operate at Westfield Topanga, Fashion Square, Westfield Culver City, Westfield Santa Anita, and Valencia Town Center for several months, merely because they have exterior entrances.  However, numerous stores similarly selling apparel, cosmetics, shoes, and housewares in the malls' interiors have been forced to close—including Metropolis Big & Tall and My Dream Boutique.  There is no reason to believe that, by virtue of their placement, stores within indoor malls and shopping centers (which almost uniformly have wide, high-ceilinged, and well-ventilated internal walkways) as a class are riskier than shopping center stores with exterior entrances.  There accordingly is no rational basis for this differential treatment among the mall's retailers—and neither the County nor any other Defendant has offered one.

72.    The arbitrariness of these classifications is particularly evident in the distinction made between department stores (in which varying types of goods are sold within different sections, and under the same roof, of the same commonly owned store) and indoor malls (in which varying types of goods are sold within separately owned stores within the same mall).  There is no rational reason to

conclude that the separate ownership of the stores within a mall pose a greater risk than the commonly owned but distinct sections of a department store.

73.     The County Order's irrationality when it comes to distinctions among retail stores is also pronounced because it permits small retailers with narrow aisles and low ceilings to remain open if they have an exterior entrance, but forbids all retailers—no matter how large and well ventilated—to remain closed if they are located in the interior of a mall or shopping center.

74.     The irrationality of the County Order is further demonstrated by the fact that the County elected to follow the Statewide Order and generally allow hair salons and barbershops to resume operations at 25% maximum capacity, in accordance with Tier 1 restrictions, beginning on September 2, 2020.  County Order ¶ 9(e).  Yet not only can Salon Dioro, located in Fashion Square's interior and offering haircuts and coloring, not resume operations, but neither can interior retailers such as Express Jewelry and Repairs, which repairs jewelry in Westfield Culver City's interior, a service that requires no person-to-person contact.  It is inexplicable that the County Order would choose to defy State guidance with respect to indoor malls—which easily allow for social distancing when at reduced capacity—but to follow the State's directive when it comes to salons and barbershops, as long as the business is not located in the interior of an indoor mall.

75.     As a result of these irrational policies, consumers seeking products and services are now limited to shopping in a smaller number of governmentally favored businesses, resulting in a greater concentration of consumers in a smaller number of retail locations, rather than a disbursement of those people across large spaces where social distancing would actually be more achievable.

**Virtually All Other Jurisdictions Have Rejected Defendants' Arbitrary Interior/Exterior Mall Dichotomy**

76.     The County Order's decision to close indoor malls and their interior retailers while allowing retail stores with exterior entrances to remain open stands in

stark contrast to the approaches taken not only by California, but also by state and local governments throughout the country.  Although some states and localities initially distinguished between interior and exterior mall and shopping center retailers, they have virtually unanimously eliminated such distinctions as policymakers became aware of the actual science and data.  And some states, such as Florida and Texas, never recognized the arbitrary interior/exterior distinction at all.

77.    To Plaintiffs' knowledge, no state still prohibits indoor malls and shopping centers from operating, and Los Angeles County is the *only* California county to prohibit indoor mall and shopping center operations while allowing exterior retailers to remain open.  In fact, only five of the 32 commercial retail properties that Westfield manages—which span seven states and six California counties—are currently closed:  Westfield Topanga, Fashion Square, Westfield Culver City, Westfield Santa Anita, and Valencia Town Center.  The County is an extreme outlier, to the detriment of My Dream Boutique, Ms. Khachatryan, Ms. Virabyan, Salon Dioro, Mr. Avetisyan, Al-Azim, Mr. Mohammed, all of the County's other businesses and residents, and the community at large.

**Plaintiffs Have Been Afforded No Process To Challenge The Lack Of Any Rational Basis For The County Order Or The Distinctions It Draws**

78.    According to the County Order, Dr. Davis, as County Health Officer, may "issue Orders that are more restrictive than the guidance and orders issued by the State Public Health Officer" only "after consultation with the Board of Supervisors."  County Order ¶ 25.  There is no evidence that Dr. Davis consulted with the Board before issuing the County Order, which is more restrictive than the Statewide Order.  The lack of consultation is apparent, as any consultation would have had to occur during a meeting open to the public under California's Ralph M. Brown Act, California Government Code § 54950 *et seq.*

79.     No other process was available to Plaintiffs or other interested members of the public to present data to the County Health Officer or Board or otherwise influence the County Order before it went into effect.

80.     Even though the County Order remains effective indefinitely, it does not allow for any process to challenge, before the County Health Officer or Board, its irrational classifications and determinations.

81.     If a process were available, Plaintiffs would present scientific evidence showing that indoor malls, shopping centers, and their interior retailers present no greater public health risk than outdoor malls, other retailers, big-box stores, barbershops, hair salons, and other businesses that have been allowed to remain open or reopen.  In fact, Plaintiffs would present evidence showing that indoor malls and shopping centers are *safer* and allow ample opportunities for social distancing, and that retailers like My Dream Boutique, Salon Dioro, and Al-Azim, as well as managers like Westfield, have made substantial investments and developed stringent protocols to protect employees and customers from the spread of COVID-19.

### Defendants' Irrational Actions Have Harmed
### Plaintiffs And Residents Throughout the County

82.     The County's arbitrary closure of indoor malls and their interior retailers has caused, and will continue to cause, substantial harms to Plaintiffs, their employees, the community, and the retailers, operators, and employees of indoor malls and shopping centers throughout the County.  These harms include monetary losses due to reduced income, sales, and rent payments, and non-monetary and existential losses in the form of the loss of customer goodwill.  My Dream Boutique, Salon Dioro, and Al-Azim and other retailers also face the potential long-term loss of customer traffic, as consumers adjust their shopping habits; utilize more and more retailers outside of Westfield Topanga, Fashion Square, Westfield Culver City, Westfield Santa Anita, and Valencia Town Center; and develop potentially long-

CLASS ACTION COMPLAINT

term loyalty and brand affinity for the operating stores as a substitute for those in the interior of County malls.

83.    Al-Azim has been forced to close its only location due to the County's indefensible policy, simply because it is located in the interior of Westfield Culver City.  Al-Azim's business depends on foot traffic in the mall; closing the store has caused sales and profitability to all but vanish.  Mr. Mohammed, an owner and employee of Al-Azim, has been devastated by this sudden upheaval of his business. He began the business nearly 30 years ago with his two brothers, and they have poured their hearts and souls into building and running the business while raising their children.  The business cannot continue under these conditions, and Al-Azim anticipates that it will be forced to permanently close Metropolis Big & Tall if the County does not immediately lift the closure order.

84.    Due to the steep dropoff in sales and profitability, Al-Azim is no longer able to pay Mr. Mohammed a salary or shareholder dividends.  Mr. Mohammed is living off of savings and minimal unemployment insurance payments to support himself and his family.

85.    My Dream Boutique has similarly been forced to close simply because it operates in the interior of Fashion Square.  Although it offers merchandise on its website and through curbside pickup, the store relies on foot traffic within the mall and has seen sales and profitability plummet since the closure.  Mother and daughter Ms. Khachatryan and Ms. Virabyan run the store together and have given everything they have to build their family business from scratch.  The store must place orders with vendors many months in advance, and the full orders that My Dream Boutique placed prior to the COVID-19 pandemic have recently arrived, without any discounts or relief to the business.  Inventory is piling up in the store as it is unable to sell the new arrivals and merchandise from last season.  My Dream Boutique could not cancel these orders without threatening the long-term viability of the business, because vendors would cancel the store's accounts if it refused to accept

orders. The business cannot continue to operate as inventory and bills pile up—My Dream Boutique estimates that it would have to permanently close in the next month or two if indoor operations at Fashion Square do not reopen.

86. Because of the closure and resulting loss of sales, My Dream Boutique is no longer able to pay Ms. Khachatryan or Ms. Virabyan a salary or shareholder dividends. They have relied on unemployment insurance payments and savings to get by, but have been forced to take out large loans to cover payments to vendors and to keep their business afloat.

87. Despite the Statewide Order clearing the way for salons and barbershops to reopen throughout California in late August, Salon Dioro remains closed merely due to its location in Fashion Square's interior. The business depends on both foot traffic within the mall, and the loyalty of repeat customers that often see the same stylist for haircuts and coloring for years. Salon Dioro has built this customer loyalty over almost a decade in business at Fashion Square, but the longer the salon remains clothed, the more customers will find stylists at other salons, and perhaps make a permanent switch. Mr. Avetisyan is devastated by this downturn of the business he and his wife have worked so hard to build, and Salon Dioro anticipates that it would only continue for another month or two before it is forced to permanently close.

88. As a result of the County Order, Salon Dioro is no longer able to pay Mr. Avetisyan a salary or shareholder dividends. Mr. Avetisyan is living off of savings and minimal unemployment insurance payments to support himself and his family.

89. My Dream Boutique, Salon Dioro, Al-Azim, and likely hundreds of other interior retailers at Westfield Topanga, Fashion Square, Westfield Culver City, Westfield Santa Anita, and Valencia Town Center would reopen at 25% capacity if permitted by the County. As permitted by the Statewide Order, several Westfield-managed malls in other California counties reopened on August 31, 2020 at 25%

capacity, including Palm Desert (Riverside County), Valley Fair (Santa Clara County), and Galleria at Roseville (Placer County).  Currently, 72% to 87% of retailers at those malls are open for business.  These numbers suggest that a substantial number of interior retailers at the Westfield-managed Los Angeles County malls would quickly reopen at 25% capacity, particularly given that a number of the same retailers operate at the open malls and the currently closed County malls.  Interior retailers and their employees throughout the County, fully ready and able to reopen under the Statewide Order's restrictions, are suffering severe damages daily as their businesses remain closed and their employees remain out of work.

90.    The County Order infringes on the property rights of My Dream Boutique, Salon Dioro, and Al-Azim.  Interior retailers, including My Dream Boutique, Salon Dioro, and Al-Azim, lease space specifically to provide retail shopping and services to the public , a safe and lawful purpose that would be possible virtually anywhere else in the country.  My Dream Boutique, Salon Dioro, and Al-Azim and other similarly situated interior retailers have property rights in those leases, have licenses allowing them to do business, have property rights in the continued operation of their businesses, and have developed substantial goodwill among customers and the public.  Many interior retailers—like My Dream Boutique, Salon Dioro, and Al-Azim—depend critically on foot traffic from the millions of mall patrons annually for sales.  The County Order prevents these businesses from operating, depriving them of these property rights.  Likewise, Westfield Topanga, Fashion Square, Westfield Culver City, Westfield Santa Anita, and Valencia Town Center are unable to operate for indoor public shopping—even though they are licensed for that purpose, they have developed substantial goodwill among their millions of visitors each year, and their owners have invested hundreds of millions of dollars to make these malls safe and attractive shopping destinations.

91.    The County Order also infringes the rights of Ms. Khachatryan, Ms. Virabyan, Mr. Avetisyan, Mr. Mohammed, and employees of other interior retailers to pursue their chosen occupations. Ms. Khachatryan, Ms. Virabyan, Mr. Avetisyan, and Mr. Mohammed are each employees of companies whose sole business location is in an indoor mall, and is therefore closed due to the arbitrary and irrational County Order. As a result of the store closures, Ms. Khachatryan, Ms. Virabyan, Mr. Avetisyan, and Mr. Mohammed are unable to receive salaries from their companies, and their companies may soon go out of business if the County Order is not lifted immediately.

92.    Plaintiffs' damages attributable to Defendants' policies are severe and continue to mount each day.

93.    My Dream Boutique, Salon Dioro, and Metropolis Big & Tall remain closed, are unable to generate meaningful revenue, and incur losses due largely to expenses that cannot be reduced. Were the store allowed to reopen, they would see far more foot traffic and sales. Normally, My Dream Boutique employs five people, Al-Azim employs four people, and about 20 people work at Salon Dioro. However, each of these stores has had to lay off all of its employees.

94.    These injuries only begin to describe those that interior retailers have suffered and will continue to suffer. Interior retailers selling perishable goods, for example, face significant losses due to the possibility of inventory spoilage while their stores remain closed.

95.    The sustained closures of Westfield Topanga, Fashion Square, Westfield Culver City, Westfield Santa Anita, and Valencia Town Center also affect the rent retailers pay, causing damage to Westfield and the mall owners. Interior retailers generally pay a minimum monthly rent, certain pass-through charges (such as for maintenance and taxes—which are still fully assessed while the malls remain closed), and a percentage of gross sales. Although retailers are obligated to pay minimum monthly rent during the term of their lease even if their stores are not open,

many interior retailers at Westfield Topanga, Fashion Square, Westfield Culver City, Westfield Santa Anita, and Valencia Town Center are unable to generate revenue to pay rent because the County Order prevents them from operating their stores in the mall. Accordingly, many have sought rent concessions and renegotiation of the terms of their leases. The longer the interior of these malls stays closed, the more likely it becomes that retailers will be forced out of business, damaging the retailers, their employees, Plaintiffs, and the community.

96. Westfield's malls are planned and designed in what is referred to in the industry as a "cooperative enterprise" or a "co-dependent enterprise," with a curated mix of retailers designed to allow for an efficient flow of customers, maximize commercial transactions, and make each mall an attractive lifestyle destination in its particular community. Due to the dependency of the stores upon one another to form a well-functioning whole, departures of retailers can wreak havoc on other retailers and on the revenues and value of the mall itself. Indeed, retail leases often include a "co-tenancy clause" that provides for rent reduction if vacancies in the mall reach a certain threshold. Vacancies in a mall breed additional vacancies because a mall's reputation is dependent on stores being open and operating, and the effort required to rehabilitate lost reputation is incalculable. Further, when stores close, not only does the mall experience revenue and value loss, but the mall is also forced to incur taxes, maintenance obligations, and other expenses that departing tenants had been paying as part of their lease obligations. The cascading, domino effect of both direct monetary losses and intangible and reputational harm to Westfield's malls in the County will be overwhelming absent immediate relief from the County Order.

97. The County Order is enforceable through criminal sanctions. State law authorizes law enforcement, including Defendant Alex Villanueva, in his official capacity as Sheriff of the County, to enforce orders of the County Health Officer. *See, e.g.*, Cal. Health & Safety Code § 101029; Cal. Gov't Code § 26602. The County Order itself requests the assistance of law enforcement to "ensure

compliance with and enforcement of this Order" and makes "[t]he violation of any provision of this Order . . . a public nuisance . . . punishable by fine, imprisonment, or both." County Order ¶ 27. Plaintiffs and their employees—along with the many other interior retailers and their employees—would thus face criminal penalties if they violated the terms of the arbitrary and unsupported County Order.

## **CLASS ACTION ALLEGATIONS**

98.    My Dream Boutique, Salon Dioro, and Al-Azim (collectively, "Class Plaintiffs") bring this action pursuant to Federal Rule of Civil Procedure 23(a), (b)(1)(A), (b)(2), and (b)(3) on behalf of themselves and all others similarly situated. The proposed class is defined as follows:

> All retailers at Westfield Topanga, Fashion Square, Westfield Culver City, Westfield Santa Anita, and Valencia Town Center that do not have an exterior entrance and are not "Essential Businesses" as defined in the County of Los Angeles Health Officer's Order, titled "Reopening Safer at Work and in the Community for Control of COVID-19," and last revised on September 4, 2020, and that thus must remain closed to the public for in-person shopping under the terms of that Order.

99.    The proposed class is so numerous that joinder of all members is impractical. According to Plaintiffs' records, over 550 interior retailers at Westfield Topanga, Fashion Square, Westfield Culver City, Westfield Santa Anita, and Valencia Town Center are not Essential Businesses (approximately 180 retailers at Westfield Topanga, 82 at Fashion Square, 105 at Westfield Culver City, 117 at Westfield Santa Anita, and 74 at Valencia Town Center). Many of them are small businesses that have experienced severe financial hardship due to prolonged closures amid the COVID-19 pandemic and are unable to institute suit on their own behalf. In addition, the County Order was recently issued, and immediate relief from it is necessary. There is insufficient time to join all members of the proposed class.

100.    There are questions of law and fact that are common to the proposed class. All members of the proposed class are interior retailers at Westfield Topanga,

Fashion Square, Westfield Culver City, Westfield Santa Anita, and Valencia Town Center that are not Essential Businesses and are thus closed to public, in-person shopping and services due to the County Order.  Members of the proposed class have suffered common federal and state constitutional injuries from the County Order, which arbitrarily and irrationally treats proposed class members differently based solely on their location in the interior of a mall—a distinction that has no scientific or other rational basis.  Members of the proposed class have suffered, and will continue to suffer, injury to their property rights, financial harms, and loss of goodwill due to the County Order.  Their shared common facts and harms will ensure that judicial findings regarding the legality of the County Order will be the same for all members of the proposed class.  Should Class Plaintiffs prevail, *all* proposed class members will benefit, as the interior of Westfield Topanga, Fashion Square, Westfield Culver City, Westfield Santa Anita, and Valencia Town Center—and proposed class members' businesses—will be permitted to reopen.

101.  Class Plaintiffs' claims are typical of the claims of the proposed class.  Class Plaintiffs and proposed class members raise common legal claims and are united in their interests and injuries.  Class Plaintiffs are interior retailers at Fashion Square and Westfield Culver City that are not Essential Businesses, and have thus been forced to close to the public by the County Order.  The other class members are interior retailers at Westfield Topanga, Fashion Square, Westfield Culver City, Westfield Santa Anita, and Valencia Town Center that are not Essential Businesses, and have thus been forced to close to in-person public shopping and services by the County Order.  Class Plaintiffs and the members of the proposed class are thus victims of the same, unlawful order, for which Defendants are responsible.

102.  Class Plaintiffs are adequate representatives of the proposed class.  Class Plaintiffs seek relief on behalf of the proposed class as a whole and have no interest antagonistic to other members of the proposed class.  To the contrary, Class Plaintiffs' interests are *aligned* with those of other proposed class members:  Class

Plaintiffs' businesses depend on foot traffic from the mall; when more stores are open, more shoppers come to the mall, increasing Class Plaintiffs' potential customer base.  Class Plaintiffs' goal is to declare the unlawful County Order invalid, to prevent enforcement of the County Order against Class Plaintiffs and other retailers at Westfield Topanga, Fashion Square, Westfield Culver City, Westfield Santa Anita, and Valencia Town Center, and to obtain compensation for the property, financial, and other harms the County Order has inflicted on them. Class Plaintiffs seek the same remedies for all class members.  They are represented by attorneys from Latham & Watkins LLP, who are experienced in class actions and complex constitutional litigation against government actors, and have the resources to successfully obtain class relief.  Class Plaintiffs and their counsel intend to prosecute this action vigorously.

103.   Members of the proposed class may be ascertained from Plaintiffs' business records and can be personally notified of the pendency of this action by first-class mail, e-mail, personal service, and/or published notice calculated to reach all such members.

104.   As this action involves the validity of the County Order, inconsistent or varying adjudications with respect to individual members of the proposed class could establish incompatible standards of conduct for Defendants.  *See* Fed. R. Civ. P. 23(b)(1)(A).

105.   Defendants have acted or refused to act on grounds that apply generally to the proposed class, and final declaratory and injunctive relief is appropriate respecting the proposed class as a whole.  *See* Fed. R. Civ. P. 23(b)(2).

106.   The questions of fact and law common to Class Plaintiffs and members of the proposed class predominate over any questions affecting individual members. A class action is superior to other available methods for fairly and efficiently adjudicating this controversy because, among other things:  (a) the County Order applies to all proposed class members, Class Plaintiffs and proposed class members

are entitled to uniform relief, and individualized actions could result in incompatible standards of conduct for Defendants; (b) members of the proposed class could not reasonably be expected to seek legal redress individually, as they are suffering severe financial hardship from the continued forced closure of their businesses; (c) time is of the essence to keep Class Plaintiffs and other proposed class members from going out of business; (d) it is desirable to concentrate this litigation in this District since Class Plaintiffs, other proposed class members, Westfield, Westfield Topanga, Fashion Square, Westfield Culver City, Westfield Santa Anita, Valencia Town Center, and Defendants are all located in the District; (e) the class action procedure provides the benefits of adjudicating the issues raised in a single proceeding, economies of scale, and comprehensive supervision by a single court; and (f) this action presents no unusual management difficulties. *See* Fed. R. Civ. P. 23(b)(3).

107.   For these reasons, this case should be certified as a class action.

## **FIRST CAUSE OF ACTION**

### **(42 U.S.C. § 1983 and *Ex Parte Young*—Equal Protection)**

108.   All of the foregoing paragraphs are incorporated as though fully set forth herein.

109.   The Fourteenth Amendment to the United States Constitution forbids Defendants from "deny[ing] any person . . . the equal protection of the laws." The basic principle animating this command is that the government must treat similarly situated persons similarly; "[w]hen those who appear similarly situated are nevertheless treated differently, the Equal Protection Clause requires at least a rational reason for the difference." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 602 (2008).

110.   Under the County Order, many businesses—including big-box retailers like Walmart, large department stores located in malls, and small businesses, including barbershops—are allowed to open to the public, if they have an exterior

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

CLASS ACTION COMPLAINT

entrance. Yet similarly situated non-essential businesses located in indoor malls and shopping centers cannot open to the public for in-person shopping and services at all—just because of their interior locations. And even the operations of essential businesses located in indoor malls and shopping centers are restricted by comparison with like businesses not located in indoor malls or shopping centers. County Order ¶ 9(d); *see* Appendix E.

111. There is no rational reason for this difference in treatment. The Statewide Order allows indoor malls and shopping centers to reopen, and the County Order classifies indoor malls and shopping centers as Lower-Risk Businesses, the same classification given to many other businesses that are allowed to open. County Order ¶ 9. The County Order cites no evidence supporting the determination to force indoor malls and shopping centers to remain closed while allowing other, similar businesses to open. And there is none. According to the scientific evidence, indoor malls and shopping centers, and the stores connected to them, pose no greater public health risk than other, similar businesses that are allowed to open.

112. The only distinguishing feature of the interior stores that must stay closed is the need to pass through the vast common areas of indoor malls for access. But retail shopping—including at stores that are allowed to remain open—almost always involves being indoors. There is nothing about the indoor common areas of indoor malls and shopping centers that makes transmission of COVID-19 there more likely than in other retail properties. To the contrary, the common areas of indoor malls and shopping centers generally are wider and higher ceilinged than the narrower aisles of big-box stores and department stores, much less the far more cramped spaces inside smaller stores and businesses, and thus offer better air circulation and more room for social distancing—factors key to inhibiting the spread of COVID-19.

113. Moreover, interior retailers like Class Plaintiffs, and indoor mall and shopping center managers like Westfield, stand ready to abide by capacity

limitations, social distancing measures, and other guidelines meant to inhibit the spread of COVID-19. Indeed, Plaintiffs have invested significant resources and developed stringent protocols meant to protect employees and customers that go beyond what many jurisdictions require.

114. The disparate treatment visited on indoor malls and shopping centers is wholly irrational and violates equal protection. Plaintiffs and the proposed class have suffered harm to their property rights, financial harm, and harm to their goodwill on account of the County Order, and will continue to suffer such harms unless Defendants are enjoined from enforcing the County Order against them.

## SECOND CAUSE OF ACTION

## (42 U.S.C. § 1983 and *Ex Parte Young*—Due Process)

115. All of the foregoing paragraphs are incorporated as though fully set forth herein.

116. The Fourteenth Amendment to the United States Constitution forbids Defendants from "depriv[ing] any person of life, liberty, or property, without due process of law." This prohibition includes a substantive component—protection from arbitrary government action—and a procedural component—a guarantee of appropriate process before a governmental deprivation of a protected interest. *See, e.g.*, *Daschke v. Hartenstein*, 420 F. Supp. 3d 919, 937 (D. Ariz. 2019) (citing cases).

117. By forcing interior retailers to remain closed to the public, the County Order deprives Plaintiffs and proposed class members of several interests protected by due process, including, among other things, the right to use Westfield Topanga, Fashion Square, Westfield Culver City, Westfield Santa Anita, and Valencia Town Center, and premises leased to interior retailers, for their intended, longstanding, and otherwise lawful purpose of providing indoor shopping and services to the public; the right to allow public access to the interior of Westfield Topanga, Fashion Square, Westfield Culver City, Westfield Santa Anita, and Valencia Town Center, and the premises leased to interior retailers, including Class Plaintiffs and proposed class

members; the right to pursue one's chosen occupation; the right to continued business operations; rights under business licenses; and business goodwill. *See, e.g.*, *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1316-17 (9th Cir. 1989).

118.    These deprivations are wholly arbitrary.  The Statewide Order allows indoor malls and shopping centers to reopen, and the County Order classifies indoor malls and shopping centers as Lower-Risk Businesses, a category that is generally allowed to reopen.  There is no scientific evidence showing that indoor malls and shopping centers pose any greater public health risk than businesses that the County Order allows to open, nor any rational basis for inferring such a distinction.  And the County Order does not even attempt to provide any valid public health-related reason for treating indoor malls and shopping centers differently.

119.    The County Order also fails to afford those whose rights it compromises any process whatsoever.  Before the County Order went into effect, Plaintiffs, proposed class members, and other interested members of the public had no opportunity to present data showing that indoor malls and shopping centers are safe, and that the distinctions the County Order draws are irrational.  Nor does the County Order provide any post-deprivation process.  Even though the County Order has no fixed end date, and could remain effective for the foreseeable future, it provides no process for challenging the arbitrary distinctions it draws between businesses allowed to open and those forced to stay closed.  *See* County Order ¶ 28.

120.    There is no justification for this total lack of process.  The COVID-19 pandemic has persisted for months, and absent some process for challenging the County Health Officer's decision indoor malls and shopping centers could remain closed indefinitely, for no valid reason.  "[E]ven the war power does not remove constitutional limitations safeguarding essential liberties." *Bowles v. Willingham*, 321 U.S. 503, 521 (1944) (citation omitted).

121.    If due process were available, Plaintiffs would present scientific evidence showing that indoor malls and shopping centers present no greater public

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

health risk than outdoor malls, other retailers, big-box stores, barbershops, hair salons, and other businesses that have been allowed to remain open or reopen.

122.   The continued forced closure of indoor malls and shopping centers, as well as their interior retailers, violates due process.  Plaintiffs and the proposed class have suffered harm to their property rights, financial harm, and harm to their goodwill on account of the County Order, and will continue to suffer such harms unless Defendants are enjoined from enforcing the County Order against them.

### **THIRD CAUSE OF ACTION**
### **(42 U.S.C. § 1983—*Monell*)**

123.   All of the foregoing paragraphs are incorporated as though fully set forth herein.

124.   Pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), the County and the Board are liable for damages when a County policy, custom, or practice is the moving force behind a constitutional violation.  *See, e.g.*, *Castro v. County of Los Angeles*, 833 F.3d 1060, 1073 (9th Cir. 2016) (en banc).

125.  Dr. Davis, the County Health Officer, is a county officer and policymaker authorized to issue orders on behalf of the County, to enforce those orders, and to request the assistance of law enforcement in enforcing those orders.  *See, e.g.*, Cal. Health & Safety Code §§ 101000, 101029, 101030, 101040.  The County Order represents an official policy, custom, or practice of the County.

126.  The County Order directly causes the constitutional violations described above.  Under state law and the Statewide Order, indoor malls and shopping centers are allowed to open.  The County Order—and only the County Order—requires the arbitrary, irrational, and discriminatory closure of indoor malls and shopping centers.

127.  The County and the Board have exhibited deliberate indifference to constitutional rights by, for example, allowing the County Health Officer to issue

the County Order without the consultation directed under the terms of the County Order.

128. Under *Monell*, the County and the Board are liable for damages resulting from the constitutional violations described above.

## FOURTH CAUSE OF ACTION

### (California Constitution—Article I, § 7)

129. All of the foregoing paragraphs are incorporated as though fully set forth herein.

130. Under article I, § 7 of the Constitution of the State of California, "[a] person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws." This provision is "self-executing." *Katzberg v. Regents of the Univ. of Cal.*, 58 P.3d 339, 342 (Cal. 2002); *see* Cal. Const. art. I, § 26 ("The provisions of this Constitution are mandatory and prohibitory, unless by express words they are declared to be otherwise."). And it is "not dependent on [the rights] guaranteed by the United States Constitution." Cal. Const. art. I, § 24.

131. "California's state equal protection guarantee . . . is broader than its federal counterpart." *People v. Cowan*, 260 Cal. Rptr. 3d 505, 536 (Ct. App. 2020) (Streeter, J., concurring); *see id.* (collecting cases). The irrational closure of indoor malls and shopping centers while other Lower-Risk Businesses are allowed to open, which violates federal equal protection principles, necessarily also violates California equal protection principles.

132. California's due process guarantee is also broader than its federal counterpart, focusing on the "due process liberty interest to be free from arbitrary adjudicative procedures" and "protect[ing] a broader range of interests" than the United States Constitution. *Ryan v. Cal. Interscholastic Fed'n—San Diego Section*, 114 Cal. Rptr. 2d 798, 814 (Ct. App. 2001). As discussed above, the County Order arbitrarily forces the closure of indoor malls and shopping centers and deprives

Plaintiffs and the proposed class of, among other things, the right to use Westfield Topanga, Fashion Square, Westfield Culver City, Westfield Santa Anita, and Valencia Town Center, and premises leased to interior retailers, for their intended, longstanding, and otherwise lawful purpose of providing indoor shopping and services to the public; the right to allow public access to the interior of Westfield Topanga, Fashion Square, Westfield Culver City, Westfield Santa Anita, and Valencia Town Center, and the premises leased to interior retailers, including Class Plaintiffs and proposed class members; the right to pursue one's chosen occupation; the right to continued business operations; rights under business licenses; and business goodwill—all without any pre- or post-deprivation process whatsoever. The County Order therefore offends California due process principles.

133.    The County Order violates article I, § 7 of the California Constitution. Plaintiffs and the proposed class have suffered harm to their property rights, financial harm, and harm to their goodwill on account of the County Order, and will continue to suffer such harms unless Defendants are enjoined from enforcing the County Order against them.

### FIFTH CAUSE OF ACTION

### (California Constitution—Improper Delegation Of Legislative Power)

134.    All of the foregoing paragraphs are incorporated as though fully set forth herein.

135.    The California Constitution prohibits State and local governmental entities from delegating legislative power. *See Kugler v. Yocum*, 445 P.2d 303, 304-05 (Cal. 1968); *see id.* at 305 ("[T]he doctrine prohibiting delegation of legislative power . . . is well established in California."). To prevent an unlawful delegation of legislative power, a legislative body must, at a minimum, "declare a policy, fix a primary standard, and authorize executive or administrative officers to prescribe subsidiary rules and regulations that implement the policy and standard and to determine the application of the policy or standard to the facts of particular cases."

*Birkenfeld v. City of Berkeley*, 550 P.2d 1001, 1028 (Cal. 1976).  In addition, a legislative body must "establish an effective mechanism to assure the proper implementation of its policy decisions."  *Id.* at 1029; *see Gerawan Farming, Inc. v. Agric. Lab. Rels. Bd.*, 405 P.3d 1087, 1103 (Cal. 2017) ("[A] statute delegating legislative power must be accompanied by 'safeguards adequate to prevent its abuse.'" (quoting *Kugler*, 445 P.2d at 306)).

136.   If the County Order was not an executive action subject to due process and other limitations, then it was a legislative act.  But if the County Order was a legislative act, it would plainly transgress California principles regarding the delegation of legislative power.

137.   Dr. Davis's authority to issue the County Order is based on California Health & Safety Code §§ 101040, 101085, and 120175.  *See* County Order at 2. Section 101040(a) allows a health officer to "take any preventive measure that may be necessary to protect and preserve the public health from any public health hazard during any 'state of war emergency,' 'state of emergency,' or 'local emergency,' as defined by Section 8558 of the Government Code, within his or her jurisdiction." Section 101040(b) defines "preventive measure" broadly, meaning "abatement, correction, removal or any other protective step that may be taken against any public health hazard that is caused by a disaster and affects the public health."  Section 101085(a)(1) allows a health officer, during a health emergency, to require information needed "to take any action necessary to abate the health emergency . . . or protect the health of persons in the jurisdiction, or any area thereof, who are, or may be affected."  Section 120175 requires a health officer who knows that a reportable infectious disease exists within his or her jurisdiction to "take measures as may be necessary to prevent the spread of the disease or occurrence of additional cases."

138.   These statutes do not provide any articulable standard to guide a health officer's actions.  These statutes do not require a health officer to make any findings

based on evidence, and they provide no standards to judge what measures are "necessary to protect and preserve the public health" and when those measures are no longer "necessary."  The statutes give health officers virtually limitless authority to take any "protective step" they deem necessary in their sole discretion.

139.   Moreover, the statutes provide absolutely no safeguards to prevent abuse.  There is no requirement that the health officer periodically review his or her orders, and there is no statutory process to challenge a health officer's order.  Even if the lack of safeguards were defensible during short-term health emergencies, it is completely indefensible during a global pandemic that has already lasted months and may persist for many more.  The authority of the unelected health officer to regulate conduct for an indefinite period of time cannot go unchecked.  *Cf. Birkenfeld*, 550 P.2d at 1029-30 (charter amendment invalid because it effectively prevented rent control board from adjusting rents, "making inevitable the arbitrary imposition of unreasonably low rent ceilings" for an "indefinite period").

140.   The concerns underlying the nondelegation principle are on full display here.  The County Order provides no reason why it is "necessary to protect and preserve the public health" to force indoor malls and shopping centers to stay closed when other retail businesses may open.  Nor is there in fact any valid public health reason to force indoor malls and shopping centers to remain closed.  Yet Dr. Davis's decision to force them to stay closed is effective indefinitely, County Order ¶ 28, and is not subject to administrative review.

141.   The statutory delegation of legislative power to health officers is invalid, on its face and as applied to the County Order.  As a result, the County Order, issued pursuant to California Health & Safety Code §§ 101040, 101085, and 120175, is ultra vires and cannot be enforced.  Plaintiffs and the proposed class have suffered harm to their property rights, financial harm, and harm to their goodwill on account of the County Order, and will continue to suffer such harms unless Defendants are enjoined from enforcing the County Order against them.

## **PRAYER FOR RELIEF**

WHEREFORE, Class Plaintiffs, on behalf of themselves and the proposed class, and the other Plaintiffs pray for the following relief:

1.    Certification of this action as a class action under Federal Rule of Civil Procedure 23(a), (b)(1)(A), (b)(2), and (b)(3), appointment of Class Plaintiffs as class representatives, and appointment of Latham & Watkins LLP as class counsel;

2.    Judgment in favor of Plaintiffs and the proposed class and against Defendants on all causes of action alleged herein;

3.    General, special, compensatory, and incidental damages according to proof;

4.    A declaration that the County Order is invalid for one or more of the reasons alleged herein;

5.    Injunctive relief preventing the County Order from being enforced against Plaintiffs and the proposed class;

6.    Any and all other equitable relief, including preliminary and permanent injunctive relief, that the Court deems appropriate;

7.    An award to Plaintiffs for costs, expenses, and reasonable attorneys' fees as permitted by law; and

8.    An award of such other and further relief as the Court deems just and proper.

Dated:  September 28, 2020          LATHAM & WATKINS LLP
Michael G. Romey
Richard P. Bress
Andrew D. Prins
Sarah F. Mitchell
Eric J. Konopka


By  */s/ Michael G. Romey*
Michael G. Romey
*Attorneys for Plaintiffs and the Proposed Class*

CLASS ACTION COMPLAINT

1

# **DEMAND FOR JURY TRIAL**

2

Plaintiffs hereby demand a trial by jury on all issues so triable.

3

Dated:  September 28, 2020

LATHAM & WATKINS LLP

4

Michael G. Romey
Richard P. Bress

5

Andrew D. Prins
Sarah F. Mitchell

6

Eric J. Konopka

7

8

By  */s/ Michael G. Romey*

Michael G. Romey

9

*Attorneys for Plaintiffs and the Proposed Class*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28